IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHLEY BUTLER and FAIR HOUSING PARTNERSHIP OF GREATER PITTSBURGH,<br><br>    Plaintiffs,<br><br>    v.<br><br>SUNDO CAPITAL, LLC, MICHAEL SUNDO, and SLADACK HOLDINGS, LLP,<br><br>    Defendants. | 2:20-cv-1607-NR |

## MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiffs Ashley Butler and the Fair Housing Partnership of Greater Pittsburgh bring this case against Defendants Sundo Capital, LLC, Michael Sundo, and Sladack Holdings, LLP for violating the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and various Pennsylvania statutes.

Ms. Butler is a victim of domestic violence[1] and stalking by her ex-husband. When she informed Defendants that her ex-husband's behavior had caused her to fear for her life at her residence, they refused to let her out of her lease without penalty. Ms. Butler still surrendered possession of the property to Mr. Sundo, which triggered an early termination clause in the lease that accelerated all remaining rental payments. When she didn't pay, Defendants filed a landlord-tenant action to recover this accelerated rent and other damages. Ms. Butler then pursued an administrative housing complaint with the Pennsylvania Human Relations Commission against Defendants. Soon after, Defendants responded by filing an

---

[1] The Court uses the term "domestic violence victim," rather than "domestic violence survivor," because that is the term that Plaintiffs have used in their pleading. The Court defers to Plaintiffs' preference for the proper terminology to use in this case.

- 1 -

amended pleading in their landlord-tenant action that Plaintiffs allege contained "new, false" claims for more damages.

From these core allegations, Plaintiffs bring claims under the Fair Housing Act and various Pennsylvania statutes. For their FHA claims, Plaintiffs allege that the early termination clause is discriminatory because it has a disparate impact on domestic violence victims the majority of whom are women, that Defendants retaliated against Ms. Butler for filing her administrative complaint, and that Plaintiffs are entitled to punitive damages because of Defendants' discriminatory conduct.

Defendants argue that all of Plaintiffs' FHA claims fail as a matter of law for four reasons. First, the disparate impact claim fails because "domestic violence victim" is not a protected class that is recognized under the FHA. Second, Plaintiffs failed to meet the "robust causality" requirement for a disparate impact claim because they have not pled facts or statistics connecting Defendants' challenged policy to the alleged disparate impact. Third, Defendants never retaliated against Mr. Butler because they were simply following the rules of civil procedure in pursuing their claims in their landlord-tenant action. Fourth, punitive damages under the FHA are unavailable because there is no viable predicate offense.

Separately, Defendants argue that without viable FHA claims, the Court should not exercise supplemental jurisdiction over the pendant state-law claims. Defendants also claim that Plaintiffs have improperly sued Mr. Sundo and Sladack Holdings because neither is a party to the lease that Ms. Butler and her ex-husband signed, and therefore the Court should dismiss them.

Applying the familiar and well-settled standard of review for a Rule 12 motion, the Court will deny Defendants' motion in all respects for the reasons discussed below.

**DISCUSSION & ANALYSIS**[2]

I. **Plaintiffs have adequately pled their sex discrimination claim under a disparate impact theory.**

The FHA prohibits discrimination based on "race, color, religion, sex, familial status, or national origin" in various real estate-related transactions. 42 U.S.C. § 3604. A plaintiff can bring unlawful discrimination claims under three distinct legal theories: "disparate treatment, disparate impact and failure to reasonably accommodate." *Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514, 522 (W.D. Pa. 2007) (citation omitted). Plaintiffs' discrimination claim focuses exclusively on the disparate impact theory. ECF 1, ¶¶ 34-100.

To establish a disparate impact claim under the FHA, the plaintiff must show (1) the occurrence of certain outwardly neutral practices, (2) which have a significantly adverse or disproportionate impact on members of the protected class. *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 467 (3d Cir. 2002). Disparate impact claims "do not require proof of discriminatory intent," and "permit federal law to reach conduct that has the necessary and foreseeable consequence" of causing discrimination by burdening a particular group. *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 381 (3d Cir. 2011).

Here, Plaintiffs allege that Defendants' facially neutral policy of "[r]efusing early lease termination in cases involving domestic violence has an inherent disparate impact on female tenants." ECF 1, ¶ 97. Defendants agree that their policy is neutral on its face. *See* ECF 9, p. 11. Thus, this dispute comes down to the second element—whether the early termination clause, as applied to cases involving

---

[2] The Court mainly writes for the benefit of the parties, who are familiar with the allegations in Plaintiffs' complaint and the procedural background of the case.

domestic violence, has a significantly adverse or disproportionate impact on a protected class.

On this score, Defendants make two core arguments. First, Ms. Butler is not a member of a recognized protected class under the FHA. Second, Plaintiffs have insufficiently pled that the challenged policy caused the alleged disparate impact. After careful consideration, the Court finds neither of these arguments persuasive at this early stage of the proceedings.

### A. Ms. Butler is a member of a "protected class" under the FHA.

Defendants argue that "domestic violence victims or survivors" are only treated as members of a "protected class" for purposes of the FHA under "certain eviction circumstances." ECF 9, p. 9. Since this "is not an eviction situation," Defendants contend that Plaintiffs cannot bring their disparate impact claim. *Id.* at pp. 9-10. Defendants' view, however, conflicts with both the existing case law and the broad, remedial purpose of the FHA.

It is true that the "FHA does not expressly include domestic violence victims or survivors as protected classes." *Wilson v. Guardian Mgmt., LLC,* 383 F. Supp. 3d 1105, 1108 (D. Or. 2019). That said, there is "substantial case law and scholarship … suggesting that claims alleging discrimination based on status as a victim of domestic violence are not *per se* invalid." *Id.* at 1109. Moreover, in 2011, the then-HUD Deputy Assistant Secretary for Enforcement and Programs issued a report that explained that discrimination against victims of domestic violence "because of their history or the acts of their abusers" may be illegal under the FHA. HUD, *Assessing Claims of Housing Discrimination against Victims of Domestic Violence under the Fair Housing Act (FHA) and the Violence against Women Act (VAWA), available at* https://www.hud.gov/sites/documents/FHEODOMESTICVIOLGUIDENG.pdf (last visited on Sept. 10, 2021).

These claims are not *per se* invalid because domestic violence victims tend to overwhelmingly be women. The U.S Department of Justice reports that 85% of victims of intimate partner violence nationwide are women. ECF 1, ¶ 91 (citation omitted). So, essentially, discrimination against domestic violence victims is likely to be discrimination against women, and therefore the effects of that discrimination are more acutely felt by women. *Id.* at ¶¶ 93-94 (citations omitted).

Although the Third Circuit has not weighed in on this issue, most district courts that have addressed it have found that domestic violence victims are members of a protected class and may bring a claim for housing discrimination under the FHA through a theory of sex discrimination. *See, e.g.*, *Wilson*, 383 F. Supp. 3d at 1110 ("Summary judgment against Plaintiff's housing discrimination claims is not warranted simply because those claims are based on her status as a domestic violence victim"); *Dickinson v. Zanesville Metro. Hous. Auth.*, 975 F. Supp. 2d 863, 872 (S.D. Ohio 2013) (finding that use of plaintiff's status as a domestic violence victim to evict could support a claim of sex discrimination under the FHA); *Meister v. Kansas City*, 2011 WL 765887, at *6 (D. Kan. Feb. 25, 2011) ("[E]vidence that defendant knew that domestic violence caused damage to plaintiff's housing unit would help support a claim that she was evicted under circumstances giving rise to an inference of sex discrimination.").[3]

---

[3] One court from this Circuit reached the opposite conclusion. *See Delgado v. Morris Cnty. Hous. Auth.*, No. 18-15092, 2018 WL 5962478, at *5 (D.N.J. Nov. 13, 2018) ("[B]eing a domestic violence victim on public assistance is not a protected class under FHA."). But that case has limited persuasive value because the court did not explain how it came to that conclusion or cite any case law to support it. *See, e.g.*, *Antonelli v. Gloucester Cnty. Hous. Auth.*, 2019 WL 5485449, at *7 (D.N.J. Oct. 25, 2019) ("But this opinion did not consider whether evidence that the defendant was aware the plaintiff was victim of domestic violence could give rise to an inference of sex discrimination, and as such, this Court does not find *Delgado* persuasive.").

Defendants argue that while these cases recognize domestic violence victims' membership in a protected class under the FHA, they limit that membership to eviction cases. *See* ECF 9, p. 9. That is not correct. While most of these cases were decided in the context of evictions, there is nothing in those decisions that specifies that domestic violence victims can **only** bring cases challenging evictions. Indeed, in *Dickinson*, the court held that plaintiff could bring a discrimination claim based on defendant's act of sending negative reference letters to other landlords. 975 F. Supp. 2d at 872. This broader scope of potential claims makes sense given "the well established principle that in interpreting the Fair Housing Act, courts are to give effect to the broad remedial intent of Congress embodied in the Act." *Fair Hous. Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 F. App'x 469, 480 (6th Cir. 2006) (cleaned up).

Plaintiffs are therefore not barred from bringing their disparate impact claim based on Defendants' allegedly discriminatory enforcement of their early termination and rent acceleration provisions.

### B.  Plaintiffs have adequately pled causation.

The "Supreme Court [has] emphasized that courts should only use disparate-impact claims to remove artificial, arbitrary, and unnecessary barriers, rather than displace valid governmental and private priorities." *Reyes v. Waples Mobile Home Park Ltd. P'Ship*, 903 F.3d 415, 424-25 (4th Cir. 2018) (cleaned up). As a result, certain "safeguards must be implemented" to "avoid hailing defendants into court for … disparities they did not create and to prevent governmental and private entities from using numerical quotas to avoid disparate impact challenges[.]" *Id.* One such safeguard is the "plaintiff's need to demonstrate a 'robust causality requirement.'" *Id.* at 425 (quoting *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 521 (2015)).

"To establish causation in a disparate-impact claim, the plaintiff must begin by identifying the specific practice that is challenged." *Id*. "The plaintiff must also demonstrate that the disparity they complain of is the result of one or more of the practices that they are attacking, specifically showing that each challenged practice has a significantly disparate impact on the protected class." *Id*. (cleaned up). "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Communities*, 576 U.S. at 543.

As discussed above, in their complaint, the specific policy that Plaintiffs are challenging is "Defendants' policy of refusing early lease terminations and of accelerating all contract rents" in "cases involving domestic violence[.]" ECF 1, ¶¶ 89, 97.

To establish causation, Plaintiffs rely on an array of statistics and the "reasonable inferences" that can be drawn from them. While they admittedly do not plead any statistics that establish a direct link between enforcement of early termination and acceleration clauses and a disparate impact on victims of domestic violence, they have offered enough to support the inference. That is, Plaintiffs have pled that, statistically speaking, victims of domestic violence are overwhelmingly women (ECF 1, ¶ 91), victims of domestic violence are more likely to suffer from physical violence or stalking, particularly at or near their home (*id*. at ¶ 92; ECF 19, p. 17)), and victims are often in a precarious economic situation (ECF 1, ¶¶ 93-96). Those facts, taken as true, suggest the following causal chain:



The type of statistical evidence offered here is analogous to what was pled in *Reyes*, which that court held was enough to survive a motion to dismiss. 903 F.3d at 428-29. In *Reyes*, the plaintiffs alleged that the defendants' policy of requiring all occupants of a trailer park above the age of eighteen to provide documentation evidencing legal status or face eviction disproportionately impacted Latinos. *Id.* at 428. In support, the plaintiffs pointed to statistics showing that Latinos constituted 64.6% of the total undocumented immigrant population in the relevant area, and were ten times more likely than non-Latinos to be harmed by the policy. *Id.* The court held that, "accepting [those] statistics as true," the plaintiffs "sufficiently alleged a prima facie case of disparate impact." *Id.* The court reached that decision because the statistical evidence suggested that "the specific Policy requiring all adult Park tenants to provide certain documents providing legal status was likely to cause Latino tenants at the Park to be disproportionately subject to eviction compared to non-Latino tenants at the Park." *Id.* at 429.

As was the case in *Reyes*, the statistics Plaintiffs pled in the complaint are enough to satisfy the robust causality requirement set forth in *Inclusive Communities*, at least at the pleading stage. As a result, the Court will deny Defendants' motion to dismiss Plaintiffs' disparate impact claim.[4]

To be clear, Plaintiffs' statistics work here because they are anchored to the specific policy that they challenge—a policy that is narrowly applied in cases

---

[4] Defendants also attack the complaint by suggesting that it "contradicts itself" because it simultaneously alleges that Defendants refused to terminate Ms. Butler's lease early and that Ms. Butler surrendered possession of the premises early. ECF 9, p. 12. There is nothing contradictory about these allegations. Ms. Butler asked to be released early from her lease because she was afraid of her ex-husband and the stalking she was experiencing. When her request was denied, and the stalking escalated, Ms. Butler moved out of the apartment without permission and surrendered possession to Defendants.

involving domestic violence.  This is important because when relying on statistics in a disparate impact case, the statistics must relate to both the impacted group and the comparator group.  *See, e.g., Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994-95 ("[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion [complained of] because of their membership in a protected group."); *Reyes*, 903 F.3d at 428-29.  Here, the impacted group is women; the comparator group is tenants who are in a domestic violence situation.  Based on the statistics pled, women comprise a disproportionately large number of those in the overall comparator group.

The Court makes this clarification because at oral argument and in their supplemental brief, Plaintiffs appear to expand the scope of the challenged policy. Specifically, Plaintiffs mention that it was Defendants' policy of enforcing certain provisions in its leases, generally, against all tenants, that led to the disparate impact.  ECF 19, p. 10 ("Here, Plaintiffs identify three facially neutral policies included in Ms. Butler's lease that have the effect of prohibiting early lease termination by the tenant (while permitting this by the landlord) and imposing the penalty of full rent acceleration in the event the tenant vacates the dwelling before the expiration of the full lease term."); ECF 20, 29:15-19 ("Those are the policies. It's a prohibition against early termination in the lease.  By the way, there is a unilateral right for the landlord to do so in the lease, and it's the acceleration of rent clause whenever there is an early lease termination."). Plaintiffs may not amend their pleading through argument or their briefing, so the Court need not address the impact of this broader policy right now.  *See Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (cleaned up). But if Plaintiffs were to seek leave to amend to modify the challenged policy, the

Court has serious concerns that challenging such a broadly applicable policy could support a plausible claim, based on the statistics currently pled.

That is, if the harmful policy were framed in such a broad manner (*i.e.*, applicable to all tenants seeking early lease termination, rather than cases involving domestic violence), then the statistics that Plaintiffs plead in their complaint about the sex of domestic violence victims stop short. They stop short because they do not reflect and isolate the other non-domestic violence related reasons that tenants seek termination and are subject to rent acceleration (*e.g.*, failure to pay rent, moving to another city, and so on).

Put differently, if the comparator group is "all tenants subject to the rent-acceleration clause," then Plaintiffs would have to plead facts or statistics showing that a disproportionate number of women or domestic violence victims are subject to the rent-acceleration clause compared to all tenants subject to it. Plaintiffs may be able to do that, but they don't make such allegations in the current complaint. Again, the Court's reading of the complaint is that the policy is much narrower, and based on that narrow policy, Plaintiffs state a disparate impact claim.

**II.    Plaintiffs have adequately pled their retaliation claim.**

Along with their disparate impact claim, Plaintiffs allege that Defendants retaliated against Ms. Butler for filing a complaint with the PHRC by pursuing "new[,] false" claims against her in their Allegheny County landlord-tenant action. ECF 1, ¶ 80.

"To prevail on a § 3617 retaliation claim, a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) the defendant subjected her to an adverse action; and (3) a causal link exists between the protected activity and the adverse

action." *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 904 (E.D. Pa. 2017) (citations omitted).[5] Plaintiffs have met their pleading burden for this claim.

Defendants concede that Plaintiffs have met the first element. That's because Ms. Butler's filing of a complaint with the PHRC is a recognized "protected activity" under the FHA. *See Prince v. Malaugh*, No. 16-6179, 2019 WL 193651, at *7 (E.D. Pa. Jan 11, 2019) ("Plaintiffs engaged in a protected activity when they filed a complaint with the PHRC[.]").

Defendants do not really dispute that its new claims were "adverse" to Ms. Butler, either. To meet the adverse activity element, Plaintiffs allege that Ms. Butler "suffered an adverse action when Defendants added additional, false claims to the Landlord-Tenant complaint Defendants had previously filed against Mr. Butler." ECF 11, p. 14. Legal claims in our adversarial system clearly meet that definition. *See, e.g.*, *Batista v. Cooperativa De Vivienda Jardines De San Ignacio*, 776 F.3d 38, 44-45 (1st Cir. 2015) (allowing claim to move forward under the retaliation provision of the FHA where a landlord launched collection proceedings against her); *Haws v. Norman*, No. 15-422, 2017 WL 4221064, at *11 (D. Utah 2017) (holding that the landlord's filing of a small claims action to recover $1,400 plus fees based on the accrued charges for the tenant's service dog constituted an adverse action under the retaliation provision of the FHA).

Instead, Defendants focus their challenge on whether their alleged filing of new claims in their landlord-tenant action is causally connected to Ms. Butler's complaint with the PHRC. Defendants argue that Plaintiffs have not pled enough to raise a plausible inference of causation, but the Court is not convinced.

---

[5] After establishing those elements, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Newell v. Heritage Senior Living, LLC*, No. 12-6094, 2016 WL 427371, at *7 (E.D. Pa. Feb. 3, 2016) (cleaned up).

For the causation element, Plaintiffs contend that the alleged close temporal proximity between Ms. Butler's filing of her administrative complaint with the PHRC and Defendants' filing of "new, false" claims in their civil lawsuit (about a month), coupled with the "additional indicia of causation" in the complaint, is enough at the pleading stage. ECF 11, p. 15. The Court agrees with Plaintiffs.

A plaintiff may "rely upon a broad array of evidence" to establish the required causal link, including temporal proximity. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "[D]etermining whether temporal proximity will be sufficiently suggestive to establish causation is necessarily dependent on the facts of each case." *Romanaskas v. Earthbox, Inc.*, No. 16-517, 2018 WL 1370876, at *3-4 (M.D. Pa. Feb. 23, 2018), *report and recommendation adopted*, 2018 WL 1370612 (M.D. Pa. Mar. 16, 2018). Thus, the "relative evidentiary impact of temporal evidence may vary depending upon the stage of the *McDonnell Douglas* proof analysis, and the procedural circumstance." *Farrell*, 206 F.3d at 279 n.5. "[T]herefore, each case must be considered with a careful eye to the specific facts and circumstances encountered." *Id.*

Here, Plaintiffs argue that the one-month gap is unusually suggestive under the circumstances of this case because "Defendants had the opportunity to assert the additional allegations against Ms. Butler in their original eviction complaint, but only did so after Ms. Butler filed a civil rights administrative complaint against them[.]" ECF 11, p. 17. It's this change in behavior, when coupled with the relatively brief temporal gap, that supports a finding that Plaintiffs have alleged a plausible causal link. The temporal gap itself must also be put into the proper context. Remember, the alleged retaliatory action is bringing new claims in a legal proceeding. That takes time and coordination. Discovery could reveal that the plan to retaliate was, in truth, hatched immediately.

Viewing these facts in the light most favorable to Plaintiffs, as the Court must at this stage, supports an inference of retaliation. Plaintiffs are entitled to further factual development, and the Court will deny Defendants' motion to dismiss Plaintiffs' retaliation claim.[6] *E.g.*, *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177-78 (3d Cir. 1997) ("By summarily concluding that there was too great a gap between Kachmar's protected acts [four months] and her termination, the district court failed to give Kachmar the opportunity to delve further into the facts by discovery); *Fogarty v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ*, No. 19-173, 2019 WL 5310661, at *6 (W.D. Pa. Oct. 21, 2019) (Horan, J.) (finding that one-month proximity enough to "sufficiently plead[] a claim for retaliation").

### III. Plaintiffs have adequately pled their claim for punitive damages.

Defendants next argue that since "Plaintiffs have failed [to] plead any facts to support a plausible claim for a violation of Sections 3604 and 3617," their "claim for damages under Section 3613 is unwarranted."  ECF 9, p. 15.  Section 3613 states that punitive damages are appropriate in fair housing cases "if the court finds that a discriminatory housing practice has occurred or is about to occur[.]"  42 U.S.C. § 3613.

---

[6] Defendants also argue that there can be no causation because they were "merely proceeding in accordance with the Pennsylvania Rules of Civil Procedure for District Justices and seeking damages and past due amounts in accordance with the lease[.]" ECF 9, p. 14.  Essentially, Defendants are asserting that they had a nonretaliatory motive for adding these new claims to their lawsuit.  That may be true, but at this early stage, the Court cannot resolve that factual dispute.  *See Dreibelbis v. Cty. of Berks*, 438 F. Supp. 3d 304, 321 (E.D. Pa. 2020) ("Moreover, as with its arguments in support of dismissal of Dreibelbis' other discrimination claims, the County's contention that it had a non-retaliatory reason for terminating Dreibelbis, thereby rebutting her prima facia claim, is premature. This contention is appropriately made either on a well-developed summary judgment record or at trial.") (cleaned up); *cf. Humphrey v. Sec'y Pa. Dep't of Corr.*, 712 F. App'x 122, 125 n.2 (3d Cir. 2017) ("Although prison officials may prevail on a retaliation claim by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, dismissal on this basis in this case would have been premature at the motion-to-dismiss stage.") (cleaned up).

Because Plaintiffs' claims under Sections 3604 and 3617 are moving forward, the Court will deny Defendants' request to dismiss Plaintiffs' corresponding claim for punitive damages. *See, e.g., El v. People's Emergency Ctr.*, 315 F. Supp. 3d 837, 844 (E.D. Pa. 2018) ("Moving Defendants seek to dismiss the claim for punitive damages. As punitive damages are available under the FHA, this issue is better resolved on a developed record.").

### IV. This Court has supplemental jurisdiction over Plaintiffs' state-law claims.

Defendants contend that Plaintiffs' state-law claims "should be dismissed as a matter of course resulting from Plaintiffs' failure to plead sufficient facts to support its claims for violation of the Fair Housing Act." ECF 9, p. 16. As discussed above, however, Plaintiffs adequately pled their claims under the FHA. Defendants have asserted no other reason to dismiss Plaintiffs' state-law claims. Thus, this Court retains supplemental jurisdiction over them. *See Samuelson v. Mid-Atl. Realty Co., Inc.*, 947 F. Supp. 756, 763 (D. Del. 1996) ("Both parties have agreed in their briefs that Samuelson's state law claim is part of the same case or controversy as his FHAA claim. Neither party asserted this case presents a novel issue of state law and the Court sees no exceptional or compelling reason to decline jurisdiction over Samuelson's claim.").

### V. Plaintiffs properly named Mr. Sundo and Sladack Holdings as defendants.

Finally, Defendants argue that the "Court must dismiss Michael Sundo, in his individual capacity, and Sladack Holdings as Defendants as they have been improperly named as Defendants to the within action." ECF 9, p. 7. Not so. Mr. Sundo's personal involvement in the alleged violations of the FHA and Sladack Holdings' role as owner of the property make them appropriate defendants.

For Mr. Sundo, Plaintiffs allege that he was the property manager and the "sole decision-maker and actor whose actions and omissions give rise to the claims in this case." ECF 11, p. 18. "[A]gents such as property managers can be held liable when they have personally committed or contributed to a Fair Housing Act violation." *Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272, 1293 (S.D. Fla. 2014) (cleaned up); *see also Andujar v. Hewitt*, No. 02-2223, 2002 WL 1792065, at *10 (S.D.N.Y. Aug. 2, 2002) ("Aggrieved persons have long been permitted to assert Fair Housing Act claims against individual defendants who engaged in affirmative acts of discrimination or enforced a corporation's discriminatory rules or policies." (citations omitted)). The complaint outlines the various ways that Mr. Sundo was personally involved in the alleged violations of the FHA.

For example, Plaintiffs allege that Ms. Butler spoke to Mr. Sundo about her issues with her ex-husband and surrendered possession of the property directly to him. ECF 1, ¶¶ 43, 56, 59. They also allege that Mr. Sundo refused to release her from her lease, threatened legal action against her, and, along with the other Defendants, decided to accelerate her rent and pursue the specific legal claims against her in Defendants' landlord-tenant action. *Id.* at ¶¶ 60-69, 76-89. Plaintiffs have therefore sufficiently alleged Mr. Sundo's personal participation in the alleged discriminatory and retaliatory practices to survive a motion to dismiss. *See, e.g.*, *Richards v. Bono*, No. 04-484, 2005 WL 1065141, at *7 (M.D. Fla. May 2, 2005) ("[T]he complaint contains allegations that Mrs. Bono may be liable directly. … Accordingly, the Court concludes that there is no reason at present to dismiss Mrs. Bono as a defendant.").

As for Sladack Holdings, Plaintiffs allege that it "is the legal owner of the dwelling at issue that was rented by Ms. Butler and her family." ECF 1, ¶ 13. The Third Circuit has made it clear that "the duty of a landlord under the Fair Housing

Act not to discriminate in the leasing of property may not be delegated to the landlord's employee." *Alexander v. Riga*, 208 F.3d 419, 433 (3d Cir. 2000). As a result, "[w]here a property manager," like Sundo Capital or Mr. Sundo, allegedly "violates fair housing requirements, the property owner," in this case Sladack Holdings, "is vicariously liable for those violations." *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1092 (E.D. Cal. 2016); *see also Walker v. Crigler*, 976 F.2d 900, 905 (4th Cir. 1992) ("Whitesell, despite forbidding discrimination on the part of Crigler, cannot, under the Fair Housing Act, dispose of his duty to prevent sexual discrimination in the renting of 124 Falls Avenue, a property which he owned and which was operated for his benefit."); *United States v. Garden Homes Mgmt., Corp.*, 156 F. Supp. 2d 413, 426 (D.N.J. 2001) ("[P]roperty owners have a non-delegable duty not to discriminate and, as a result, will be held vicariously liable for the discriminatory actions of their rental agents.").

Mr. Sundo and Sladack Holdings are proper defendants, at least at this preliminary stage of the case.

## CONCLUSION

For the reasons discussed above, the Court will deny Defendants' Motion to Dismiss without prejudice to Defendants raising these arguments again at summary judgment. An appropriate order follows.

DATED this 10th day of September, 2021.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge